## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARC GRENIER, *Administrator of the Estate of Shengyl Rasim*, S.C.O., *ppa James T. Brennan*, O.C.O., *ppa James T. Brennan*,<br>      Plaintiffs,<br><br>     v.<br><br>CHRISTOPHER STRATTON, IV, ROBERT GUTHRIE, ROBERT URRATA, CITY OF WEST HAVEN, GEORGIANA V. MEYER, *Administratrix of the Estate of Frank Meyer*,<br>      Defendants. | No. 3:11-cv-00808 (JAM) |

## RULING GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In the early morning hours of January 17, 2010, Selami Ozdemir broke into the home of his estranged wife, Shengyl Rasim, and he shot her to death before turning the gun on himself to commit suicide. Ozdemir murdered his wife in the presence of their infant child and while their elder child lay in bed in a nearby bedroom of the family apartment. This case involves claims by plaintiffs—the estate of Shengyl Rasim as well as a representative of their two children—that the police in West Haven, Connecticut wrongly failed to prevent this horrific crime.

Defendants now move for summary judgment on two of the four counts charged in plaintiffs' amended complaint. First, defendants seek summary judgment as to plaintiffs' claim that the police violated the Equal Protection Clause of the United States Constitution when they failed to protect Rasim and her children by reason of their race, ethnicity, and national origin. Defendants further seek summary judgment as to the children's claim under Connecticut state

1

tort law for "bystander emotional distress."[1]

For the reasons set forth below, I grant in part and deny in part the motion for summary judgment. As to the Equal Protection claim, I grant summary judgment for defendant Meyer for lack of any evidence suggesting that he acted or failed to act for reasons relating to plaintiffs' race, ethnicity, or national origin. I otherwise deny summary judgment as to defendants Stratton and Guthrie on the basis that a genuine issue of fact remains whether the death of Rasim was the result of their breach of duties as police officers by reason of discriminatory animus on account of plaintiffs' race, ethnicity, or national origin.[2] As to the bystander emotional distress claim, I grant defendants' motion for summary judgment because of the lack of evidence that the type of harm suffered by the children meets the stringent legal requirements for a claim of bystander emotional distress.

**Background**

In light of the standards governing a motion for summary judgment, the following facts are set forth as viewed in the light most favorable to plaintiffs. The decedents Ozdemir and Rasim lived with their young children at an apartment at 341 Blohm Street in West Haven, Connecticut. On August 12, 2009, decedent Rasim flagged down a patrolling police car driven by defendant Officer Christopher Stratton, IV, and she reported that she and her husband Ozdemir had had an altercation and that he had left. Stratton told her to call the police if Ozdemir returned and if he started an argument. Stratton also called and left a message for Ozdemir to contact him (without apparent response).

---

[1] Defendants do not seek summary judgment as to the other two counts of the amended complaint. Count Two alleges a claim of state law negligence, and Count Four seeks statutory indemnification pursuant to Conn. Gen. Stat. § 7-465 by the City of West Haven for the actions of the individual police official defendants. Because defendants do not seek summary judgment as to the negligence claim, the facts set forth in this ruling focus on those most pertinent to the Equal Protection and bystander emotional distress claims, rather than additional facts that may be significant to plaintiffs' negligence claim. *See also Grenier v. City of West Haven*, 2012 WL 4092587 (D. Conn. Sept. 17, 2012) (ruling on motion to dismiss).

[2] None of the other defendants are named in Count One.

A few weeks later, on September 3, 2009, another West Haven police officer responded to the Blohm Street home and found Rasim bleeding and with red marks on her face. She said Ozdemir had beaten her. The police filed for a temporary protection order on Rasim's behalf, and they arrested Ozdemir on assault and threatening charges. The police also removed three firearms belonging to Ozdemir from his home.

So far as the West Haven police are concerned, the next and fateful events took place several months later on January 16 and 17, 2010. At about 5:30 p.m. on January 16, plaintiff S.C.O.—the 6-year-old child of Ozdemir and Rasim—called 911 to report that his father was hitting his mother. Within a few minutes, Stratton and other West Haven police officers arrived, and they arrested Ozdemir again.

But Ozdemir quickly "bonded out" following his arrest, and a few hours later, at approximately 8:45 p.m., Stratton accompanied Ozdemir back to the apartment to allow him to recover his belongings in a manner that would not violate the pending protective order against him. After Ozdemir gathered his belongings, Rasim gave Ozdemir the keys to his van, and Ozdemir left. Stratton told Rasim to call the police if Ozdemir returned.

Several hours later, at 3:32 a.m. in the morning, Rasim called 911 to report that her husband was banging on the door. The civilian dispatcher who fielded her call was defendant Robert Guthrie. Rasim told Guthrie that there was a "boom, boom, boom" on the door. As Rasim was a Turkish woman with limited English language skills, Guthrie had difficulty understanding her. Guthrie spoke to Rasim in a derisive manner, stating that he did not know what "boom, boom, boom" was.

Guthrie then dispatched an officer to the scene within a minute of receiving the call. He also entered the information into the police's "computer assisted data" or "CAD" system, which

3

information was visible to Officer Stratton on the "mobile data transmission" or "MDT" system in his patrol car. Guthrie noted that the caller "speaks Spanish reporting her husband is banging on her door right now." Doc. # 78-2 (Defendants' Local Rule 56(a)1 Statement), ¶ 21.

Stratton and another officer arrived at the Blohm Street apartment at 3:36 a.m., just three minutes after the dispatch. But Ozdemir was no longer there. Stratton told Rasim to lock the doors and call the police if he returned. He also tried to get Rasim to leave and stay with friends or someplace else, but she declined. Stratton and the other police officer then searched around outside the apartment with flashlights but found no sign of Ozdemir or his van.

In the meantime, at 3:43 a.m. (while Stratton's police car was still at the Blohm Street address), another 911 call came in by someone who purported to be a work colleague of Ozdemir. This call was answered by a different civilian dispatcher, Frank Meyer (who is now deceased and for whom the administratrix of his estate is the named defendant in his place in this action). The caller said that Ozdemir was drunk, irate, and heading to the Blohm Street apartment. The caller warned that officers should "just be careful, okay, he's like he's very angry. We've also like we keep the car keys but he find it and he's going over there we so scared about him like he, he can do anything to his wife." Doc. # 85 (Plaintiffs' Local Rule 56(a)2 Statement), ¶ 22.

Meyer told the caller that officers were already on the scene (as indeed confirmed by a GPS map showing Officer Stratton's car still at the address). But he did not make an entry of this second call into the CAD system or otherwise alert patrol officers of this second call. The supervising station sergeant—defendant Sergeant Robert Urrata—assumed that the two calls (the first from Rasim at 3:32 a.m. and the second from the work colleague at 3:43 a.m.) were reporting the same event, not successive events.

Not having been advised of any second 911 call, Stratton soon left the Blohm Street address at 3:47 a.m. In reference to Guthrie's prior CAD entry noting that Rasim spoke Spanish, Stratton sent an electronic reply stating: "Turkish not Spanish. LOL."[3] *Id.*, ¶ 17. Guthrie responded: "r u sure?" *Id.* ¶ 18. Stratton replied: "yes been there sooo many times already." *Id.*, ¶ 19. Guthrie asked: "so how is your Turkish?" *Id.*, ¶ 20. Stratton replied: "sucks by [sic] I get by. LOL." *Id.*, ¶ 21.

The West Haven Police Department has a General Order dictating how police officers must respond to domestic violence calls. The General Order provides in part that "[w]here there is probable cause in a family violence case, but the accused is not present when the officer responds to the complaint, *the officer shall initiate procedures for locating him or her*." *See* Doc. # 78-3 at 19 (West Haven Department of Police Services, General Order 89-3, ¶ 5) (emphasis added). Although Stratton stated in his deposition that he went out in search of Ozdemir after leaving the Blohm Street apartment, there is substantial evidence that he did not do so or make other immediate efforts to locate him. First, his police report prepared shortly after the incident did not reflect that he undertook a search or location efforts. Second, there is no indication from police records or testimony that he put out a "be on the lookout" advisory for Ozdemir or for the van that Stratton knew from his earlier visit to the apartment that Ozdemir was driving. Lastly, the electronic communication records reflect that within the next several minutes after he left the apartment address, Stratton was in touch with other patrol officers about arranging a place to meet for dinner.

The worst soon happened. Ozdemir reappeared at the apartment within minutes of

---

[3] The Oxford Dictionary defines "LOL" as "[l]aughing out loud" or "laugh out loud," and notes that the term is "used chiefly in electronic communication to draw attention to a joke or amusing statement" or "to express amusement." Definition of *LOL* in English, Oxford Dictionaries, *available at* http://www.oxforddictionaries.com/us/definition/american_english/LOL (last accessed Aug. 29, 2014).

Stratton's departure. At 3:52 a.m., someone from the apartment called 911, and an argument was heard followed by gunshots. This call was fielded by dispatcher Meyer, and he told Sergeant Urrata that he heard sounds of a baby crying and sounds that might be gunshots.

By this point, Stratton was about a mile away, and he was dispatched to return to the apartment. First, however, Stratton called Sergeant Urrata on his cellphone to ask sarcastically "yeah, what's she calling about now?" Doc. # 85 (Plaintiffs' Local Rule 56(a)2 Statement), ¶ 29.

When Stratton and other officers arrived at the apartment, Ozdemir's van was in the driveway. They forced entry into the house and inside they found both Rasim and Ozdemir dead from gunshots and a gun under Ozdemir's body. O.C.O., the baby, was on the floor crying near his mother. He was spattered with blood but no other physical injury was apparent. S.C.O. was asleep in a bedroom. The police took both children to the hospital.

The West Haven police department later conducted an internal inquiry about the police response to the incidents that night. Among numerous adverse findings, the inquiry found that Stratton neglected his duties by failing to initiate procedures as required by General Order 89-3 for locating Ozdemir once Stratton had left the apartment just minutes before Ozdemir returned. Stratton was also found to have engaged in conduct unbecoming an employee for having responded to Sergeant Urrata's dispatch call by asking "yeah, what's she calling about now?"

The internal investigation similarly concluded that Guthrie engaged in conduct unbecoming an employee by the manner in which he responded to Rasim's initial 911 call by stating that he did not know what "boom, boom, boom is." He was also found to have neglected his duties by failing, after he received the first 911 call of January 17, to dispatch a street supervisor/sergeant to the scene, as another General Order of the West Haven police department requires when dispatch receives multiple calls regarding serious incidents at the same location.

*See* Doc. # 84-6 at 2 (West Haven police department disciplinary report finding Guthrie violated General Order 90-11). Both Meyer and Sergeant Urrata were found to have neglected their duties by failing to take further action and alert patrol officers in response to the second 911 call of January 17 from Ozdemir's co-worker.

## Discussion

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Gr., LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

   1.   *The Equal Protection Claim*

Defendants Stratton, Guthrie, and Meyer seek summary judgment on plaintiffs' Equal Protection claim (Count One). The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection

of the laws." U.S. Const. amend. XIV, § 1. As its name suggests, "[t]he Equal Protection Clause 'is essentially a direction that all persons similarly situated should be treated alike.'" *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2009) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).

Although Equal Protection claims come in many forms, *see Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (*per curiam*), a primary way to establish an Equal Protection claim is to show that a governmental actor has intentionally discriminated on the basis of race, ethnicity, or national origin and without a compelling purpose and use of narrowly tailored means in doing so. *Id.* at 77*; see also Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).

The Equal Protection Clause undoubtedly applies to affirmative enforcement decisions that police officers make on patrol, such as to a patrol officer who decides to make a traffic stop on the basis of a driver's apparent race. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 813 (1996). So, too, the Equal Protection Clause may apply to police *inaction*—if the police decline to perform their duties because of the race, ethnicity, or national origin of the member of the public to be protected. As the Supreme Court famously observed more than a century ago:

> Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

*Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1884). And as the Supreme Court has noted more recently: "The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989); *see also Elliot-Park v. Manglona*, 592 F.3d 1003, 1007 (9th Cir. 2010) (rejecting claim that only a "complete withdrawal of police protective services violates equal protection," because "diminished police services, like the seat

8

at the back of the bus, don't satisfy the government's obligation to provide services on a non-discriminatory basis").

Thus it is that a plaintiff may prove an Equal Protection claim by showing that a police official's actions *or inactions* "were 'motivated by discriminatory animus and [their] application results in a discriminatory effect.'" *Pyke*, 567 F.3d at 78 (quoting *Jana-Rock Constr., Inc. v. New York State Dep't. of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006)). This requirement of discriminatory animus—that discrimination be *intentional*—"implies more than intent as volition or intent as awareness of consequences" of an action or inaction upon the disfavored person. *Hayden v. Pearson*, 594 F.3d 150, 163 (2d Cir. 2010) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 260 (1979)). Rather, it requires that a defendant's action or inaction was "at least in part 'because of,' not merely 'in spite of,' its adverse effects" upon the disfavored person by reason of illegitimate consideration of that person's race, ethnicity, national origin, etc. *Id.* (quoting *Feeney*, 442 U.S. at 260); *see also Melendez-Garcia v. Sanchez*, 629 F.3d 25, 38 (1st Cir. 2010) (same).

In light of this framework, I have little difficulty concluding that Meyer is entitled to summary judgment on plaintiffs' Equal Protection claim because the record before me is devoid of any evidence indicating that Meyer was aware of plaintiffs' race, ethnicity, or national origin, or that his actions were influenced by any such awareness. At oral argument, plaintiffs argued that because Meyer was in a small room with dispatcher Guthrie and other police officials that horrible evening, he must have been aware of the fact that Rasim was Turkish. But there is no information in the record regarding Meyer's location that night in relation to dispatcher Guthrie or any other police officials. And, even if competent evidence did indicate that Meyer and Guthrie were working together in close quarters, it would be pure surmise for a jury to conclude

that Meyer was aware of Guthrie's interactions with Rasim or Guthrie's perceptions of Rasim's Spanish (but actually Turkish) heritage. Whatever failings or misconduct that might be ascribed to Meyer's handling of his dispatch duties, there is no evidence that he acted for any reasons related to the race, ethnicity, or national origin of Rasim or her children.

But the same cannot be said for Stratton or Guthrie when the facts are viewed—as I must do—in the light most favorable to plaintiffs. Both of them communicated in explicit terms about the perceived race, ethnicity, and national origin of Rasim (whether Spanish or Turkish) and in terms that a reasonable jury could find were derogatory. Moreover, as to whether any discriminatory animus caused harm, at least a genuine fact issue exists that both Stratton and Guthrie neglected their responsibilities in a manner that could have prevented Rasim's murder. Substantial evidence suggests that Stratton did not follow mandatory police policy to locate Ozdemir after he left the Blohm Street address, despite knowing that Ozdemir had just been there and what kind of vehicle he was driving. Additional evidence suggests that Guthrie did not dispatch a street sergeant to the scene (as required by General Order 90-11) after he received the 911 call at 3:32 a.m. on January 17. A reasonable jury could conclude that, had a street sergeant been dispatched to the scene, an immediate search would have been launched to locate Ozdemir in accordance with General Order 89-3 (and which Stratton himself did not do). A reasonable jury could further conclude that the police would have located Ozdemir or a police presence would have been on hand when Ozdemir returned to the Blohm Street apartment just minutes later, potentially averting the tragedy.

To be sure, a reasonable jury might well conclude that Stratton and Guthrie's race-related comments were no more than idle, late-night-style banter. Jurors, for example, might conclude that "LOL" as written twice by Stratton was merely an effort by Stratton to make sure that

10

Guthrie did not take his comments at all seriously. On the other hand, jurors might conclude that Stratton's use of "LOL" had yet more sinister connotations—that it was indicative along with the rest of Stratton's conduct of a dehumanizing attitude toward persons of Rasim's ethnicity and that this attitude prompted Stratton to give short-shrift to his duty to locate Ozdemir immediately rather than to devote himself to making dinner plans with other officers. *See, e.g.*, Katie Heaney, *The 12 Meanings of LOL: Because it doesn't really mean "laughing out loud" anymore*, BuzzFeed News, Apr. 29, 2013, available at http://www.buzzfeed.com/katieheaney/the-12-meanings-of-lol#4eowztu (last accessed Aug. 29, 2014).

Plaintiffs may face an uphill battle to persuade a jury that discriminatory animus explains why Stratton and Guthrie acted as they did and that their inaction caused the tragedy in this case. But at least a genuine fact issue exists, and so the inferences to be drawn from both Stratton's and Guthrie's conduct are appropriate for a jury—and not me—to decide.[4]

  2.  *The Bystander Emotional Distress Claim*

All the named defendants have also moved for summary judgment on the children's claim for bystander emotional distress (Count Four). The Connecticut Supreme Court has set forth the following standard to govern such a claim:

---

[4] The Second Circuit's decision in *Okin v. Vill. of Cornwall-on-Hudson Police Dep't.*, 577 F.3d 415 (2d Cir. 2009), is readily distinguishable from this case. In *Okin*, the court of appeals considered a woman's Equal Protection claim that certain police officers failed to respond to her complaints of domestic violence because of her gender. The court affirmed a grant of summary judgment on grounds that the plaintiff had failed to show that police officers treated her complaints differently from other similar complaints of violence. *Id.* at 439. The plaintiff in *Okin*, however, did not rely on *direct* evidence of discrimination, such as derogatory comments by police officers about her gender; thus it was that her Equal Protection claim failed not only because of the absence of direct evidence of discriminatory animus but also for lack of *indirect* evidence that might raise an inference of intentional discrimination, such as a pattern of responding differently to violence complaints by women. Here, by contrast, plaintiffs point to specific national origin-related statements by both Stratton and Guthrie; there was no need for them to show that defendants treated them differently than specific others in West Haven. For these same reasons, there is no need to consider whether Stratton or Guthrie could otherwise be liable under a "class of one" equal protection theory that may be asserted regardless of a victim's membership in a protected class. *See, e.g.*, *Fahs Const. Grp. v. Gray*, 725 F.3d 289, 291–92 (2d Cir.), *cert denied*, 134 S. Ct. 831 (2013). Moreover, in view that plaintiffs have not alleged a § 1983 *Monell* claim against the City of West Haven, they need not prove any broader policy, practice, or custom of the city or police department to discriminate on the basis of race, ethnicity, or national origin. *See Okin*, 577 F.3d at 439 (citing *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 692 (1978)).

11

> [A] bystander may recover damages for emotional distress under the rule of reasonable foreseeability if the bystander satisfies the following conditions: (1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response.

*Clohessy v. Bachelor*, 237 Conn. 31, 56, 675 A.2d 852 (1996).

Critical to a claim of bystander emotional distress—and what separates it from an ordinary wrongful death action—is evidence as noted above of harm that results from "contemporaneous sensory perception" through exposure to the harming of or presence at the scene during the immediate aftermath of injury inflicted on a loved one. *See, e.g.*, *Estate of Metzermacher v. Nat'l Railroad Passenger Corp.*, 472 F. Supp. 2d 230, 238–39 (D. Conn. 2007) (granting summary judgment on bystander emotional distress claim against father who was not present at the accident scene but first saw loved ones after the accident at the hospital). Here, despite the fact that both children will likely suffer immensely from the absence forever of their mother in their lives and from their knowledge of her violent death at the hands of their father, it has not been shown that the children have lasting harm specifically due to their presence and exposure to the specific events of January 17, 2010.

To be sure, O.C.O. was present at the killing of his mother and horrifyingly spattered by blood from the violence against her. Yet O.C.O. was only 7 months old, and plaintiffs have not adduced tenable evidence beyond surmise that O.C.O. understood, remembers, or suffers any lasting harm from the fact of having been present at the scene. Against this absence of evidence are medical and other records suggesting that there has been no such harm. O.C.O. was taken

immediately from the scene to the hospital, and hospital reports for O.C.O. over the next several days indicate that he was not in apparent distress or lethargic but was alert and playful. In addition, O.C.O. was placed in the custody of the Department of Children and Families, and reports from his foster family and DCF over succeeding months and into the next year indicate that he was thriving and otherwise presents as a happy child. Nor does the proffered affidavit of a Yale Child Study Center social worker (Doc. # 84-7) suffice to create a genuine issue of fact for O.C.O., because the affidavit opines only in general concerning the effect on O.C.O. of the loss of his mother and does not address any segregable harm occasioned to O.C.O. by the fact of his presence near his mother when she died.

     S.C.O., then age six, was in the back bedroom and was asleep when the police were there just after the murder of his mother. Doc. # 84-2 at 6 (police radio transcript). Plaintiffs have adduced no evidence to controvert defendants' evidence that one of the officers removed S.C.O. from the bedroom, covering his head with a blanket so that he could not see anything in the apartment as he was taken outside. Moreover, in an interrogatory response in this case, S.C.O. has conceded that he did not hear or see any interaction between his parents from the time that his father left the apartment following his arrest on the evening of January 16 to the time that his parents died.

     Plaintiffs rely on a later statement made by S.C.O. to his grandmother that "I saw how my father shot my mother. I saw everything under the blanket." Doc. # 84-8 at 3. But apart from the inherent implausibility of this statement (that the child could have seen "everything under the blanket"), the grandmother's statement about what S.C.O. has said is hearsay that may not properly be considered at summary judgment. *See, e.g.*, *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

In short—and without minimizing the grievous and lifelong harm that children suffer when they lose their parents because of domestic violence—no genuine fact issue suggests that either S.C.O. or O.C.O. has sustained lasting harm solely by reason of their presence in the same apartment at the time of the death of their parents. Accordingly, summary judgment is warranted as to the children's bystander emotional distress claims.

## Conclusion

Defendants' motion for summary judgment as to plaintiffs' claim under the Equal Protection Clause (Count One) is **GRANTED** as to defendant Georgiana V. Meyer (administratrix of the estate of Frank Meyer) and is **DENIED** as to defendants Christopher Stratton, IV, and Robert Guthrie. Defendants' motion for summary judgment as to plaintiffs S.C.O.'s and O.C.O.'s claims for bystander emotional distress is **GRANTED**.

It is so ordered.

Dated at Bridgeport this 8th day of September 2014.

/s/
Jeffrey Alker Meyer
United States District Judge